## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

Case No.  11-34791

DARCY R. MCLEAN
KATHLEEN MCLEAN

Debtors

ANITA COLEMAN

Plaintiff

v.                                                                Adv. Proc. No.  12-3057

DARCY R. MCLEAN

Defendant


## M E M O R A N D U M


**APPEARANCES:**    GRIBBLE CARPENTER & ASSOCIATES, PLLC
Keith L. Edmiston, Esq.
118 Parliament Drive
Maryville, Tennessee  37804
Attorneys for Plaintiff

GIBSON & JENKINS, P.A.
F.D. Gibson, Esq.
222 Ellis Avenue
Maryville, Tennessee  37804
Attorneys for Defendant


**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

On June 22, 2012, the Plaintiff filed a Complaint to Revoke Discharge of Debtor Under 11 U.S.C. § 727 on the Ground of Fraud, asking the court to revoke the discharge of the Defendant, Darcy R. McLean. The trial was held on September 16, 2013. The record before the court consists of twenty-three exhibits introduced into evidence and the testimony of three witnesses, the Plaintiff, the Defendant, and Kathleen McLean. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

## I

On January 8, 2010, the Debtor, Kathleen McLean (Ms. McLean), filed a Petition for Divorce against the Defendant in the Circuit Court for McMinn County, Tennessee, grounded on irreconcilable differences, citing a marriage date of September 24, 2001. TRIAL EX. 24. Thereafter, on April 19, 2010, a Final Decree of Divorce approved by both the Defendant and Kathleen McLean was filed in the McMinn County Circuit Court, following a hearing that same date. TRIAL EX. 3. In January 2010, either shortly before or shortly after Ms. McLean commenced the divorce proceeding, the Plaintiff and the Defendant met through an online dating website and began a relationship. In March or April 2010, the Plaintiff moved in with the Defendant and lived with him until July 2010, when he asked her to move out, after which, in August 2010, he and Ms. McLean reconciled and began living together again.

On August 26, 2011, the Plaintiff filed a Civil Warrant against the Defendant, initiating the action styled _Anita Coleman v. Darcy R. McLean_, Civil No. 97463G, in the Knox County General Sessions Court, seeking to recover $12,426.34 she had loaned the Defendant to allow him to avoid a foreclosure of his house and for payment of bills, living expenses, and medical expenses (State Court Lawsuit). TRIAL EX. 15. The court date for the State Court Lawsuit was October 10, 2011,

on which date it was dismissed without prejudice after the Plaintiff did not appear. TRIAL EX. 15. The Plaintiff, who testified that she had been unable to appear for the original court date due to work obligations, filed an Appeal of the State Court Lawsuit to the Knox County Circuit Court on October 14, 2011, and trial of the Appeal was scheduled for January 9, 2012. TRIAL EX. 17; TRIAL EX. 16.

On October 19, 2011, the Defendant and Kathleen McLean (collectively, the McLeans) filed the Voluntary Petition commencing their joint Chapter 7 bankruptcy case. COLL. TRIAL EX. 1. Thereafter, by a letter and Suggestion of Bankruptcy dated November 29, 2011, the Defendant, through his attorney, notified the Knox County Circuit Court of the bankruptcy filing. TRIAL EX. 18. The Certificate of Service for the Suggestion of Bankruptcy lists the Plaintiff although at an incomplete address that did not list her apartment number. TRIAL EX. 18. The Suggestion of Bankruptcy was later mailed to Robert Cohen, the attorney representing the Plaintiff in the State Court Lawsuit, on January 4, 2012. TRIAL EX. 19. Following the hearing on the Appeal held on January 9, 2012, of which the Plaintiff testified she was not aware and at which she did not appear, the Knox County Circuit Court entered an Order directing that the State Court Lawsuit was reset to February 17, 2012, to determine whether it should be dismissed due to the Defendant's bankruptcy filing. TRIAL EX. 20. The Plaintiff had not been listed in the Debtors' original bankruptcy schedules; however, on January 4, 2012, the Defendant filed an Amended Schedule F - Creditors Holding Unsecured Nonpriority Claims listing the Plaintiff as an unsecured creditor holding a disputed claim in the amount of $25,000.00, although once again with an incomplete address for the Plaintiff. COLL. TRIAL EX. 1; TRIAL EX. 6. The Plaintiff testified that she first learned of the Defendant's bankruptcy from Mr. Cohen in February 2012.

3

The McLeans received a general discharge of their debts on January 30, 2012, and their bankruptcy case was closed on March 5, 2012. TRIAL EX. 22. Thereafter, on March 30, 2012, an Order was entered by the Knox County Circuit Court stating that the Defendant's obligation to the Plaintiff had been discharged, and the Appeal of the State Court Lawsuit was dismissed. TRIAL EX. 21. On April 6, 2012, the Plaintiff, through her present attorney, sent a letter to the Defendant's counsel offering to forgo any action against the Defendant to revoke his discharge in exchange for him entering into a nondischargeable judgment in her favor in the amount of $6,000.00. TRIAL EX. 23. The Defendant did not enter into an agreement with the Plaintiff, and on June 22, 2012, she filed this adversary proceeding seeking to revoke the Defendant's discharge.

## II

A Chapter 7 discharge relieves the "honest but unfortunate" debtor of his or her debts, allowing a "fresh start" through the discharge. *Buckeye Ret., LLC v. Heil (In re Heil)*, 289 B.R. 897, 901, 903 (Bankr. E.D. Tenn. 2003) (citations omitted). A discharge may be revoked if "such discharge was obtained through the fraud of the debtor and the requesting party did not know of such fraud until after the granting of such discharge[,]" 11 U.S.C. § 727(d)(1); however, discharges are strongly favored and "[a]ttempts to revoke a discharge must . . . be rooted clearly in the statute." *Helbling v. Holmes (In re Holmes)*, 2008 WL 6192253, at *2, 2008 Bankr. LEXIS 4577, at *6 (Bankr. N.D. Ohio Dec. 3, 2008). Because revocation is an extraordinary remedy, courts construe § 727(d) liberally in favor of debtors and strictly against the party seeking revocation, who bears the burden of proof by a preponderance of the evidence. *Heil*, 289 B.R. at 903 (citations omitted).

4

"In order to succeed on a 727(d)(1) claim, the moving party must prove that (1) the debtor procured his discharge by fraud and (2) that the movant was unaware of the debtor's fraud prior to the discharge.  A party made aware of the fraud prior to discharge may not seek revocation." *Humphreys v. Stedham (In re Stedham)*, 327 B.R. 889, 897 (Bankr. W.D. Tenn. 2005) (citations omitted).  The fraud must be "fraud in fact on the part of the debtor, as opposed to implied fraud or mistake of law" and must have been sufficient for a court to deny discharge under § 727(a) had it been aware of the fraud prior to discharge.  *Holmes*, 2008 WL 6192253, at *3, 2008 Bankr. LEXIS 4577, at *7-8; *see also Miller v. Gilliam (In re Gilliam)*, 2012 WL 1191854, at *10, 2012 Bankr. LEXIS 1512, at *34 (B.A.P. 9th Cir. Apr. 6, 2012) ("Thus, a finding of fraud in the procurement requires evidence of some conduct that under § 727(a) would have been sufficient grounds for denying a discharge in the first instance[.]").  Additionally,

> a party requesting revocation of discharge has the burden of proving its lack of knowledge of the fraud before discharge, and a failure to carry this burden is fatal to the party's case.  [Knowledge occurs] when the party seeking revocation first becomes aware of facts such that he is put on notice of a possible fraud.  A creditor need not have actual knowledge of the fraud; it is enough to bar an action for revocation of a debtor's discharge if the creditor is put on notice to inquire further in order to timely file a complaint objecting to the debtor's discharge.  [To satisfy the requirement that he or she lacked knowledge, the] plaintiff must show due diligence in investigating and responding to possible fraudulent conduct once he or she is aware of it or is in possession of facts such that a reasonable person in his or her position should have been aware of a possible fraud.

*AmBank v. Suelflow (In re Suelflow)*, 2009 WL 2913073, at *3 (Bankr. D.N.M. June 23, 2009) (citations and footnote omitted).

As the basis for revoking the Defendant's discharge for fraud, the Plaintiff avers that she discovered, after the Defendant received his discharge, that he and Ms. McLean were actually divorced on April 19, 2010, but they falsely represented that they were married and eligible to file

a joint case. She also argues that during the time she and the Defendant lived together, he earned money as a tattoo artist which was not disclosed or included within his statements and schedules, that he did not list and value his tattoo equipment on Schedule B, and that he did not list the State Court Lawsuit in his Statement of Financial Affairs. Accordingly, the Plaintiff seeks to revoke the Defendant's discharge by proving that the Defendant's discharge would have been denied under 11 U.S.C. § 727(a)(4)(A) (2006) had she been aware of those facts and had the opportunity to file an objection prior to the granting of his discharge.

"The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to do costly investigations." *United States Tr. v. Zhang (In re Zhang)*, 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012) (quoting *Jahn v. Flemings (In re Flemings)*, 433 B.R. 230, 237 (Bankr. E.D. Tenn. 2010)); *see also Boroff v. Tully (In re Tully)*, 818 F.2d 110 (1st Cir. 1987) (stating that the purpose of § 727(a)(4)(A) "is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction."). "Any debtor who files a Chapter 7 petition has a continuous, affirmative duty to disclose the following in a complete and accurate manner: (a) a list of creditors; (b) schedules of assets, liabilities, current income, and current expenditures; and (c) a statement of financial affairs." *Wilson & Muir Bank & Trust Co. v. Eifler (In re Eifler)*, 2013 WL 3300639, at *26, 2013 Bankr. LEXIS 2654, at *68-69 (Bankr. W.D. Ky. July 1, 2013). In essence, "[s]ection 727(a)(4)(A) ensures that false, fraudulent statements by a debtor are not made without significant

consequences." *Harrington v. Webster (In re Webster)*, 2013 WL 145581, at *8, 2013 Bankr. LEXIS 188, at *22 (Bankr. D.R.I. Jan. 14, 2013).

Denial of discharge under § 727(a)(4)(A) requires proof that the Defendant (1) made a statement under oath; (2) the statement was false; (3) he knew that the statement was false when he made it; (4) he fraudulently intended to make the statement; and (5) the statement materially related to the bankruptcy case. *Ayers v. Babb (In re Babb)*, 358 B.R. 343, 355 (Bankr. E.D. Tenn. 2006) (citing 11 U.S.C. § 727(a)(4)(A)). Both affirmative false statements and omissions fall within the scope of § 727(a)(4)(A), *Searles v. Riley (In re Searles)*, 317 B.R. 368, 377 (B.A.P. 9th Cir. 2004), and statements are material if related to a debtor's bankruptcy estate, the existence and disposition of property, business enterprises or transactions, and/or matters pertinent to the discovery of assets. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 686 (6th Cir. 2000); *Lim v. Storozhenko (In re Storozhenko)*, 487 B.R. 457, 466 (Bankr. E.D. Mich. 2012). Additionally, "statements under oath" that fall within the scope of § 727(a)(4)(A) include bankruptcy statements and schedules, which are executed under penalty of perjury, and testimony given by a debtor at the meeting of creditors, in a deposition, or in a 2004 examination. *Babb*, 358 at 355.

Fraudulent intent is often discerned from a debtor's conduct, demonstrated by material representations or omissions that the debtor knows are false and are likely to create an erroneous impression, as well as reckless disregard or indifference for the truth exhibited by continuing patterns of omissions and/or false statements in his bankruptcy schedules. *Keeney*, 227 F.3d at 685; *see also Crocker v. Abad (In re Abad)*, 485 B.R. 369, 374 (Bankr. W.D. Ky. 2013); *Conine v. Foster (In re Foster)*, 2012 WL 1441418, at *3, 2012 Bankr. LEXIS 1861, at *8-9 (Bankr. W.D. Ark. Apr. 25,

2012) ("Statements made with a reckless disregard for the truth are regarded as intentionally false.").

Intent is inferred from circumstantial evidence and often turns on the debtor's credibility and

demeanor. *Babb*, 358 B.R. at 355 (citations omitted). Additionally, "[t]he elements of 'knowingly'

and 'fraudulently' may not be conflated. They each must be proven." *Abbey v. Retz (In re Retz)*,

364 B.R. 742, 754 (Bankr. D. Mont. 2007). "Knowledge that a statement is false can be evidenced

by a demonstration that the debtor 'knew the truth, but nonetheless failed to give the information or

gave contradictory information.'" *Babb*, 358 B.R. at 355 (quoting *Hamo v. Wilson (In re Hamo)*,

233 B.R. 718, 725 (B.A.P. 6th Cir. 1999)). "[W]hile mistakes do not warrant a denial of discharge,

reckless indifference or disregard can provide the foundation for a finding of fraudulent intent."

*Noland*, 387 B.R. at 743; *Hamo*, 233 B.R. at 724-25. On the other hand, "[a] false statement

resulting from ignorance or carelessness does not rise to the level of 'knowing and fraudulent.'" *Retz*,

364 B.R. at 754 (quoting *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 884 (B.A.P. 9th Cir.

2005)). It is, likewise, "well established that a court may consider the debtor's subsequent voluntary

disclosure as evidence of innocent intent[,]" *Kelly*, 135 B.R. at 461, and a debtor who mistakenly

or inadvertently provides false information or fails to disclose pertinent information and takes steps

to amend his schedules to correct them prior to or during a meeting of creditors is not generally

thought to possess the requisite fraudulent intent to deny discharge under § 727(a)(4)(A). *Keeney*,

227 F.3d at 686; *Babb*, 358 B.R. at 355-56.

> Since interested parties should not be required to drag the truth from the debtor, a
> showing of good faith in a § 727(a)(4)(A) matter will often come down to whether
> a debtor has abided by this cardinal rule: when in doubt, disclose. For example, a
> debtor is likely to be forgiven for simply mislabeling an asset, where its existence is
> still initially disclosed. However, where a debtor only voluntarily discloses
> information after its existence is uncovered by a third-party (e.g., a trustee or
> creditor), good faith is unlikely to be found.

8

*Babb*, 358 B.R. at 356 (brackets and citation omitted).  Based upon the record, the court finds that the Defendant, knowingly and with the requisite intent to deceive, failed to disclose a number of material facts in his statements and schedules and that these omissions would have been sufficient to deny his discharge under § 727(a)(4)(A).

The Plaintiff testified at trial that the Defendant earned income as a tattoo artist which he did not disclose.  The record reflects that the Statement of Financial Affairs lists income from GUBMK Construction in response to question 1. Income from employment or operation of business but does not include any tattoo income in response to either question 1. or question 2. Income other than from employment or operation of business, nor does Schedule I - Current Income of Individual Debtor(s) include any such income.  COLL. TRIAL EX. 1.  Additionally, the Statement of Financial Affairs question 18. Nature, location and name of business does not list the trade name Injun Ink on a website authorized by the Defendant listing Darcy McLean as the "Owner/Artist."  COLL. TRIAL EX. 1.  There is a discrepancy between the parties as to whether the Defendant actually earned any income as a tattoo artist, with the Defendant stating that he did not and the Plaintiff alleging that he did.  During trial, the Plaintiff testified that the Defendant did tattoos for people, including friends of hers, at his home, that she saw him take money for doing them, and that she saw on Facebook that he had continued to do tattoo work after they broke up and she moved out.  She testified that she helped him set up his business, Injun Ink, by paying for business cards, by setting up a website, and by assisting him in developing a fee schedule for his tattoo work.  For his part, the Defendant offered contradictory testimony concerning Injun Ink.  At trial, he testified that he never used the name Injun Ink; however, in his deposition taken on January 29, 2013, the Defendant testified that he began using the name Injun Ink in January 2010, TRIAL EX. 12 at pg. 9, ln. 9–12, that he was identified as

9

the owner and artist on the Injun Ink website that he created, TRIAL EX. 12 at pg. 8, ln. 23 through pg. 9, ln. 3, that he used the name Injun Ink to do "free tattoo work[,]" TRIAL EX. 12 at pg. 8, ln. 8–10, and that he used the name again when he sold his tattoo equipment to Verni Martorano, the owner of Passionfish where he is currently employed as a tattoo artist.  TRIAL EX. 12 at pg. 11, ln. 17–21.  Additionally, at trial, the Defendant acknowledged that he had created the Injun Ink website, insisting that it was done to showcase his artwork, not to promote himself as a tattoo artist.  *See* COLL. TRIAL EX. 2.  He also testified that he authorized the business cards but never handed them out.  *See* TRIAL EX. 4.  Finally, the Defendant testified at trial that he did tattoos for a couple of the Plaintiff's friends, that he took money for the tattoos but only if people wanted to pay him because it was before he was licensed by the State of Tennessee, and that he did not claim any money he received from those people on his taxes because it was not enough to declare.

Without making a determination as to whose testimony was more credible or whether the Defendant received income from tattoo work that was not disclosed in his statements and schedules, any failure by the Defendant to include income received from performing tattoo work in 2010 is irrelevant for the purposes of this adversary proceeding because, as discussed *infra* on pages 11 and 12, the Plaintiff knew these facts at the time she is deemed to have learned of the bankruptcy filing and, in fact, testified at trial and in her deposition taken on January 29, 2013, that she told Mr. Cohen about the Defendant's tattoo work and that there had been a website and business cards authorized by the Defendant using the business name Injun Ink.  *See, e.g.,* TRIAL EX. 13 at pg. 16, ln. 25 through pg. 17, ln. 10.

The record also reflects that the Defendant did not list, in response to question 4. Suits and administrative proceedings, executions, garnishments and attachments on the Statement of Financial Affairs, the State Court Lawsuit which was pending on the October 19, 2011 petition date and did not list the Plaintiff in his Schedule F - Creditors Holding Unsecured Nonpriority Claims such that she was not included in the creditor matrix filed by the Defendant and used by the court to send notice of the bankruptcy filing to creditors. COLL. TRIAL EX. 1.  When asked why he did not disclose the pending State Court Lawsuit in his Statement of Financial Affairs or list the Plaintiff as an unsecured creditor, the Defendant testified that because there was no judgment against him and he had not accepted ownership of a debt with the Plaintiff, he felt there was no reason to list her or the lawsuit.  He later acknowledged that he had included other creditors who did not have a judgment against him and clarified that he had not listed the Plaintiff because he had not accepted ownership of the debt she claimed against him.

Because she was not listed, the Plaintiff did not receive actual notice of the Defendant's bankruptcy filing until she was advised by Mr. Cohen of the filing, at which time they had a discussion and the Plaintiff advised him that the Defendant had earned money from a tattoo business and they discussed the fact that if the Defendant sold his equipment, the Plaintiff was someone to whom he owed money.  TRIAL EX. 13 at pg. 14, ln. 10–19; pg. 16, ln. 17 through pg. 17, ln. 10. Nevertheless, the record also reflects that an Amended Schedule F was filed by the Defendant on January 4, 2012, *see* TRIAL EX. 6, in which he listed the Plaintiff as a creditor holding a disputed claim in the amount of $25,000.00, and although the timing of the amendment less than three weeks before the deadline to object to discharge and/or dischargeability of debts is somewhat suspect, Schedule F was amended and, even more significant to this adversary proceeding, her attorney,

Mr. Cohen, was notified of the bankruptcy case by a letter also dated January 4, 2012.[1]  TRIAL

EX. 19.  Under Tennessee law, because Mr. Cohen was acting as her attorney and agent with respect

to her dispute against the Defendant, any knowledge that he obtained about the Defendant's

bankruptcy case was imputed to the Plaintiff.  *See Ford Motor Credit Co. v. Weaver*, 680 F.2d 451,

457 (6th Cir. 1982) ("The general rule is that notice or knowledge . . . is imputed where the agent is

acting within the scope of his authority and the knowledge pertains to matters within the scope of

the agent's authority."); *WebMD Practice Servs., Inc. v. Sedlacek (In re Sedlacek)*, 325 B.R. 202, 214

(Bankr. E.D. Tenn. 2005) ("In Tennessee, it is well settled law . . . that clients are charged with the

knowledge of their attorneys under an agency theory.  Counsel's knowledge must be attributed to

his client, if the actions of the court are to have any efficacy.  Knowledge by an agent of a creditor

of the pendency of a bankruptcy case will be imputed to the creditor if his agent was employed to

collect the debt or was in charge of its collection.") (internal citations, quotation marks, and brackets

omitted).  Accordingly, because Mr. Cohen knew prior to the discharge deadline that the Plaintiff

had not been listed in the Defendant's statements and schedules, the Plaintiff is charged with the

same knowledge.[2]

    The Plaintiff also averred that the Defendant owned tables, chairs, ink guns, needles, ink, an

autoclave, drawing instructions, medical supplies, lights, and fans that he used in connection with

---

[1] The court is aware of the timing issues associated with the notice provided by the Defendant with respect to his bankruptcy case and what they insinuate, in that he notified the Knox County Circuit Court on November 29, 2011, but did not provide Mr. Cohen with notice until January 4, 2012, thirty-six days later and only seventeen days prior to the expiration of the deadline to object to discharge and/or dischargeability.  *See* TRIAL EX. 18; TRIAL EX. 19.

[2] At trial, the Plaintiff testified that her attorney-client relationship with Mr. Cohen was not a good one, that he did not communicate with or notify her of any deadlines or actions associated with either the Appeal of the State Court Lawsuit or the Defendant's bankruptcy case, and that she subsequently fired him.  With respect to the Defendant's bankruptcy case, she found out who had been appointed as the Chapter 7 trustee, contacted the trustee, and was referred to her current counsel.

his tattoo business that were not listed in his Schedule B - Personal Property, which does not, in fact, list any tattoo equipment.[3]  COLL. TRIAL EX. 1.  When questioned about the equipment in his deposition and again at trial, the Defendant testified that he only had a couple of pieces left in his possession, worth approximately $10.00 each, because he had sold the majority of his equipment in September 2011 to Verni Martorano for approximately $300.00.  *See* TRIAL EX. 12 at pg. 10, ln. 10 through pg. 11, ln. 5; pg. 12, ln. 21 through pg. 13, ln. 4.  The Defendant did not, however, disclose any transfers of property in response to question 10. Other transfers of his Statement of Financial Affairs.  COLL. TRIAL EX. 1.  In his deposition, the Defendant testified that he did not list the sale of his equipment to Verni Martorano because "I was not aware that I needed to disclose anything as far as that up to two years beforehand." TRIAL EX. 12 at pg. 13, ln. 10–19.  Just a few minutes earlier in his deposition, however, the Defendant had testified that he had sold the equipment not two years before but in September 2011, one month prior to filing his bankruptcy case, because he was "trying to liquidate to get some money to pay bills." TRIAL EX. 12 at pg. 10, ln. 10–25.  At trial, when questioned about the equipment, the Defendant testified that he had not claimed the property he retained because it was of inferior quality and not worth more than approximately $10.00 and that he had not disclosed the sale of the remainder of his tattoo equipment because he had not known he was supposed to and because he had sold it at a large net loss value-wise.  He also testified that he had not discussed it with his attorney and conceded that he had read very little of the statements and schedules filed in his case even though he knew that he was signing them under penalty of perjury.

---

[3] Although the issue was not raised by the Plaintiff, the court notes that Schedule B likewise does not disclose the dog purchased by the Plaintiff and retained by the Defendant following their breakup.

The Defendant's reasons for not disclosing the sale of his tattoo equipment in his statements and schedules are not satisfactory.  "A debtor has a paramount duty to carefully consider the questions posed on the petition, schedules, and statements and to verify that all information is correct[,]" *Ross v. Wolpe (In re Wolpe)*, 2013 WL 1700930, at *10, 2013 Bankr. LEXIS 1618, at *29 (Bankr. N.D.N.Y. Apr. 18, 2013), and "the debtor may not simply argue that he lacked the intent to deceive because he did not read the petition and accompanying documents and, hence, could not have knowingly attested to a false oath contained therein." *Rosetti v. Dranichak (In re Dranichak)*, 2012 WL 2343700, at *7, 2012 Bankr. LEXIS 2815, at *19 (Bankr. N.D.N.Y. June 20, 2012).  In *Babb*, an adversary proceeding wherein the plaintiff sought to deny discharge based, *inter alia*, on § 727(a)(4), this court held the following:

> While the Debtor's testimony with respect to his *modus operandi* concerning his dealings with First National Bank and Bruce Babb may be a correct statement of the way he conducted business, the fact remains that his failure to question what he was signing at any time evidences a reckless disregard or indifference for the truth, which was then transferred over into the same with respect to his bankruptcy statements and schedules. *See, e.g., Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 789 (Bankr. E.D. Tenn. 2003) (finding the failure to read documents before signing them rises to a level of "gross recklessness.").  This reckless disregard, when taken in conjunction with the material omissions that he never corrected along with those omissions that he corrected only after the issues were raised by the Plaintiff in this adversary proceeding, sufficiently provides the basis for denying the Debtor's discharge under § 727(a)(4).  The Plaintiff has met her burden of proof that the Debtor made false statements with an intent to deceive, such that he is not entitled to discharge.

*Babb*, 358 B.R. at 359; *see also Wolpe*, 2013 WL 1700930, at *10, 2013 Bankr. LEXIS 1618, at *19 ("If a debtor fails to read the petition or accompanying documents but nevertheless signs the declaration therein that [he] has done so, then such debtor has, at a minimum, fraudulently uttered a false oath for the purposes of §727(a)(4)(A).") (quoting *Bohm v. Dolata (In re Dolata)*, 306 B.R. 97, 149-50 (Bankr. W.D. Pa. 2004)); *Jahn v. Hughes (In re Hughes)*, 490 B.R. 784, 793 (Bankr. E.D.

Tenn. 2013) ("The Debtors explain their omissions by claiming they did not understand the meaning

of the questions or that they did not even look at their answers.  Failure to read the answers is not

a satisfactory response."); *United States Tr. v. Zimmerman (In re Zimmerman)*, 320 B.R. 800, 806

(Bankr. M.D. Pa. 2005) ("A debtor may not insulate himself from accusations of fraud by failing to

read the bankruptcy schedules prior to signing."); *Kavanagh v. Leija (In re Leija)*, 270 B.R. 497, 503

(Bankr. E.D. Cal. 2001) ("The courts have generally recognized that failure to read the schedules is

not a defense to an action under . . . [§] 727(a)(4)(A)."). Because the Plaintiff clearly did not know

that the Defendant had sold his tattoo property in September 2011, as evidenced by the allegations

in her Complaint that he owned and had failed to list the equipment in his statements and schedules

and by the fact that the letter her attorney sent to the Defendant's attorney on April 6, 2012, detailing

her grounds for seeking revocation expressly states that "[o]ur information is that Mr. McLean owns

a significant amount of tattoo equipment (chairs, table, needles, ink, etc.) that is not reported on

Schedule B[,]" TRIAL EX. 23, the court finds that the Defendant's failure to disclose the equipment

he sold was fraudulent, especially in light of the other omissions in his statements and schedules and

the Defendant's contradictory and not credible testimony concerning not only this omission but the

others as well.

The Plaintiff's final basis for revoking the Defendant's discharge focuses on the fact that the

Defendant and Ms. McLean were not married when they filed their joint bankruptcy case.  The

record reflects that the McLeans filed a joint Voluntary Petition on October 19, 2011, representing

that they were married and thus eligible to be joint debtors when, in fact, they were divorced in April

2010.[4]   The Defendant testified that in order to have insurance coverage for a procedure, he and

Ms. McLean eloped on September 24, 2001, but in order to please their families, they were

subsequently married in a church ceremony on May 18, 2002, for which a Marriage Certificate was

issued by the Loudon County Clerk in May 2002.  TRIAL EX. 25.   Due to marital problems between

them, Ms. McLean filed the Petition for Divorce on January 8, 2010, which listed a marriage date

of September 24, 2001, two children born into the marriage in 2006 and 2007, and irreconcilable

differences as the grounds for divorce.  TRIAL EX. 24.  On April 19, 2010, a Final Decree of Divorce

was entered by the McMinn County Circuit Court stating that "[t]he marriage of the parties is

dissolved because of irreconcilable differences."  TRIAL EX. 3.  When questioned about the marriage

issue at trial, the Defendant testified that the divorce granted in April 2010 applied only to the 2001

marriage, not the 2002 marriage.   In support of this line of argument, the Defendant asserts that

because they believe that they are still married, have filed joint tax returns as a married couple, and

have represented themselves as married to the public since their reconciliation in July or August

2010, he and Ms. McLean created a "marriage by estoppel" following their April 2010 divorce.  The

court disagrees.

"Tennessee courts have long held that . . . a common law marriage cannot be contracted

within this State[.]"  *Lindsley v. Lindsley*, 2010 WL 2349200, at *3, 2010 Tenn. App. LEXIS 382,

at *6-7 (Tenn. Ct. App. June 11, 2010).  "In a case of marriage by estoppel, the marriage is presumed

to be valid even though it is not technically lawful.  Marriage by estoppel is invoked 'to prevent

fraud as well as to preserve the rights of innocent third persons who would be adversely affected by

---

[4] "A joint case under a chapter of this title is commenced by the filing with the bankruptcy court of a single
petition under such chapter by an individual that may be a debtor under such chapter and such individual's spouse."
11 U.S.C. § 302 (2006).

the conduct of the parties.'" *Guzman v. Alvares*, 205 S.W.3d 375, 380 (Tenn. 2006) (quoting

*Crawford v. Crawford*, 277 S.W.2d 389, 391 (Tenn. 1955)).

> [Tennessee] courts have recognized marriage by estoppel when parties have believed
> in the validity of their marriage and have evidenced that belief by cohabitation. The
> doctrine of marriage by estoppel is applied in exceptional cases. It does not apply in
> cases where the parties knowingly live together in an unmarried state and are
> privileged to discontinue that relationship at will.

*Martin v. Coleman*, 19 S.W.3d 757, 760 (Tenn. 2000); *see also Stovall v. City of Memphis*, 2004 WL

1872896, at *5, 2004 Tenn. App. LEXIS 536, at *13 (Tenn. Ct. App. Aug. 20, 2004) (holding that

marriage by estoppel is applied only "in exceptional cases, and even then the cohabitation and public

belief that the parties are married are measured in terms of several years, not days.") (internal

citations omitted). Both the Defendant and Ms. McLean testified that they considered the April 2010

divorce to apply only to their 2001 elopement and that they agreed to allow the divorce to go through

so that the 2002 marriage would be their only marriage and that they have continued to jointly file

their tax returns and have represented to the public that they are married. Their testimony at trial

notwithstanding, the court finds it inconceivable that the McLeans truly believed that having two

separate wedding ceremonies meant that they actually had two separate and distinct marriages such

that the Final Decree of Divorce filed in April 2010 would serve to dissolve only the elopement in

2001, while leaving intact a marriage from their church wedding in 2002. This contention is not

supported by Tennessee law which states that "[i]f, upon hearing the cause, the court is satisfied that

the complainant is entitled to relief, [a decree] may be granted either by pronouncing the marriage

void from the beginning, or by dissolving it forever and freeing the party from the obligations

thereof." TENN. CODE ANN. § 36-4-119 (2010); *see also* TENN. CODE ANN. § 36-4-124 (2010)

("When a marriage is absolutely annulled, or dissolved, the parties shall severally be at liberty to

marry again."); TENN. CODE ANN. § 36-4-126 (2010) (stating that upon written stipulation of the parties that they want to reconcile, the court may suspend the divorce proceedings "so as to permit the parties to attempt such reconciliation without prejudice to their respective rights[, d]uring such period . . ., the parties may resume living together as husband and wife and their acts and conduct in so doing shall not be determined a condonation of any prior misconduct."). Additionally, the argument that the McLeans truly believed that their 2010 divorce operated only as to their 2001 elopement is not supported by the record or their actions.

At trial, Ms. McLean testified that when she filed the Petition for Divorce in January 2010, she intended to divorce the Defendant but that she changed her mind the following day. Nevertheless, during the time that the divorce action was proceeding, both she and the Defendant were in relationships and cohabited with other people, and the Defendant testified that they did not decide to reconcile until early May 2010, but he did not ask the Plaintiff to move out until July 2010. Additionally, Ms. McLean listed only one date of marriage in the Petition for Divorce – September 24, 2001 – and listed that the parties had two children "born or adopted into their marriage" with dates of birth in 2006 and 2007. Listing the children supports her testimony that she intended, when she filed the Petition for Divorce, to completely divorce the Defendant and is contradictory to her testimony that she truly believed that the Final Decree of Divorce only applied to the 2001 elopement. TRIAL EX. 24. Had Ms. McLean truly believed that there were two separate marriages, it seems logical that she would have listed both dates in the Petition for Divorce so as to be entirely divorced from the Defendant as was her stated intention on the day she filed and that she would not have listed the children – whose birth years were 2006 and 2007 – in a petition to dissolve a marriage that would have lasted only from 2001 to 2002. Similar contradictions are also evidenced

by the Defendant's trial testimony versus his testimony in his Affidavit filed on August 2, 2012, in

support of his Answer to the Plaintiff's Complaint, wherein the Defendant makes the following

contradictory averments:

> 4. My wife and I had marital problems and she moved out in January 2010. Shortly
> after that, I met Anita Coleman and she moved in with me.

> 5. My wife and I decided to reconcile and wanted our second marriage to be our
> "official" marriage.

> 6. Without benefit of a lawyer, we filed a Petition for Divorce, thinking that we
> would get rid of that marriage, copy of the petition is attached listing only the 2001
> wedding date.

TRIAL EX. 5. However, as testified by Ms. McLean, she alone filed the Petition for Divorce on

January 8, 2010, with the intention of obtaining an absolute divorce from the Defendant and, during

the time the McLeans were separated, not only did the Defendant cohabit with the Plaintiff,

Ms. McLean was likewise involved in another relationship and living with another man.

Furthermore, the law of the State of Tennessee does not support the McLeans' argument.

Under Tennessee law, a marriage solemnized by ceremony is presumed valid unless rebutted by clear

and convincing evidence. *Guzman*, 205 S.W.3d at 380. A license obtained from a county clerk

"authorizing the solemnization of a marriage" is mandatory, TENN. CODE ANN. § 36-3-103(a) (2010),

and a ceremony alone, without a license, is insufficient to create a marriage union under the eyes of

the State of Tennessee. *Harlow v. Reliance Nat'l*, 91 S.W.3d 243, 245-46 (Tenn. 2002). The

issuance of a Marriage Certificate on May 30, 2002, with a marriage date of May 18, 2002, would

insinuate that a marriage license was filed with the Loudon County Clerk following the church

ceremony between the Defendant and Ms. McLean. In his August 2, 2012 Affidavit, the Defendant

stated that he and Ms. McLean had not wanted their families to know about the elopement in 2001,

so they "had another wedding" for which they can evidence the Marriage Certificate.  TRIAL EX. 5 at ¶¶ 2-3; *see also* TRIAL EX. 25.  That raises the questions, however, of why they obtained a second marriage license and whether they actually believed, in May 2002, that their marriage on September 24, 2001 was valid, in which case, there would have been no reason for a "divorce" of that marriage in 2010, and no reason for Ms. McLean to list that date as the marriage date in the Petition for Divorce.  *See, e.g., Stovall*, 2004 WL 1872896, at *5, 2004 Tenn. App. LEXIS 536, at *15 ("If the Stovalls believed that the November 3, 1998 ceremony resulted in a valid marriage, there would have been no need for the marriage license for the second ceremony.").  In the end, notwithstanding what they believed, although the McLeans had more than one ceremony and obtained more than one marriage license, all ceremonies and licenses between them merged into one marriage which was dissolved in April 2010.  Once the divorce was final, in order for them to be lawfully married, it would have been necessary for the McLeans to obtain a marriage license and once again participate in a marriage ceremony before a proper officiant.  The facts do not support the extraordinary remedy of recognizing a marriage by estoppel, and the court declines to do so.  Because they were not, in fact, married, the Defendant fraudulently represented that he was married and eligible to file a Chapter 7 bankruptcy petition jointly with Ms. McLean.

With respect to the Plaintiff's knowledge, the Defendant testified at trial that the Plaintiff knew of the divorce in April 2010 and that they had argued about his contention that it was not a complete divorce.  He also testified that on April 19, 2010, she had taken the day off from work so that she could be with him because she knew that he was Catholic and upset about getting a divorce, even though it only divorced him from the 2001 elopement.  Additionally, in his Affidavit, the Defendant stated the following:

20

9.  Anita Coleman knew about the divorce as she had not moved out of my house yet.

10.  I received her Motion to Reopen and the statement that she did not find out about the divorce until after my discharge is false.  She had full knowledge of the second marriage and the reason I was filing divorce before April 19, 2010.

11.  I had openly discussed this with her as I was telling her of my pending reconciliation with my wife and asked her to move out.

TRIAL EX. 5 at ¶¶ 9-11.  As for Ms. McLean, she testified that she did not recall ever discussing with the Plaintiff the fact that the McLeans were divorcing.

In her deposition and at trial, the Plaintiff testified that she knew that the Defendant was married when she moved in with him but did so anyway for financial reasons, assuming that the McLeans would get a divorce, and that she lived with the Defendant until July 2010, when he asked her to move out so that he could reconcile with Ms. McLean.  She also testified that she and the Defendant had discussed him getting a divorce and that she had met Ms. McLean, but neither he nor Ms. McLean ever told the Plaintiff that they had actually obtained a divorce in April 2010.  As to when she discovered the divorce, the Plaintiff testified that she learned about it from her current attorney in March 2012, when he showed her the Final Decree of Divorce.  She also testified that the Defendant had told her about the McLeans having two marriage ceremonies.  Specifically, the Plaintiff gave the following testimony at her deposition:

Q. . . . [D]id he tell you that he had filed divorce or that divorce was pending?

A.  No.

Q.  When is the first time you found out about the divorce?

A.  The first time I found out about an actual divorce there was talk of divorce, but there was also talk of two marriages, there was talk of him getting back with her.  I didn't really know where I stood, and financially I was in a bad place.  The actual

factual time that I found out of the divorce was when Mr. Edmiston received a fax of the actual document of divorce.

Q.  Are you saying under oath that he didn't tell you that he was going to get divorced from his wife on that date he got divorced?

A.  I'm saying under oath that what he said was a lot of different things.  He told me that they had two marriages, that he was getting back with his wife, that I could stay because things might not work out with them and he loved me and he didn't want to lose me and things of that sort.  So there was a lot of things said.

Q.  But did you know of the date that he got divorced from his wife?

A.  Not for sure, no.

Q.  But you were told that there was going to be a divorce hearing?

A.  No, I was not told that "we are getting divorced."  I was told there was two marriages.

Q.  My question is: Were you told that they actually went to the courthouse and got a divorce?

A.  No.

Q.  At any time prior to your moving out?

A.  No.  When I moved out he asked me to leave because they were rekindling their love, they were getting back together.

TRIAL EX. 13 at pg. 7, ln. 9 through pg. 8, ln. 19.  With respect to the April 19, 2010 day, the Plaintiff

testified that the Defendant never told her that he was going to court for a divorce hearing, that she

worked from 8:00 o'clock a.m. until 5:00 o'clock p.m. on Mondays in April 2010, and that she did

not take off on Monday, April 19, in order to console the Defendant over his divorce.

Based upon the testimony of the parties, the court finds the Plaintiff's testimony that she did

not know that the McLeans had actually obtained a divorce in April 2010 to be credible, especially

in light of the Defendant's contradictory actions and testimony concerning this issue of his marriage

and divorce.  First, as previously discussed, there is the question of believability as to Defendant's contention that he and Ms. McLean had two separate marriages so the single divorce applied only to dissolve the 2001 elopement.  Additionally, the record is replete with contradictions made by the Defendant with respect to his tattoo business and property he owned and/or sold.  Finally, the Defendant's actions were themselves contradictory, and the court has no trouble finding that he misled not only the court in filing a joint petition but also the Plaintiff with respect to his marriage and subsequent reconciliation with Ms. McLean.

### III

Because the court has determined that the Defendant's discharge would have been denied under § 727(a)(4)(A) had the Plaintiff been privy to the pertinent facts prior to entry of discharge and the deadline to object thereto, the court likewise finds that cause exists under § 727(d)(1) to revoke the Defendant's discharge entered on January 30, 2012.  This revocation applies only to the Defendant and does not affect the discharge granted to Ms. McLean.

A Judgment consistent with this Memorandum will be entered.

FILED:  October 30, 2013

                              BY THE COURT

                              */s/  RICHARD STAIR, JR.*

                              RICHARD STAIR, JR.
                              UNITED STATES BANKRUPTCY JUDGE